Knute **GILBERT**, Sr., Bjorne Lee, Pete Shurovloff, Edgar S. Smith, Jr., Appellants,

v.

**STATE of Alaska, DEPARTMENT OF FISH AND GAME, BOARD OF FISHERIES, Appellees.**

No. S–2963.

Supreme Court of Alaska.

Dec. 7, 1990.

Arthur S. Robinson, Robinson, Beiswenger, Ehrhardt, Soldotna, for appellants.

Larri Irene Spengler, Asst. Atty. Gen., Douglas B. Baily, Atty. Gen., Juneau, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This case presents a challenge to a Board of Fisheries regulation imposing a limit on the total harvest of Chignik bound sockeye salmon in the Stepovak fishery. The appellants claim that the regulation is invalid on four grounds: (1) the amended regulation

was adopted in violation of public notice requirements; (2) the regulation was adopted to conform to an invalid Board policy; (3) the regulation violates the uniform application clause, article VIII, section 17 of the Alaska Constitution; and (4) the regulation is unreasonable, arbitrary and capricious.

I

In November 1984, the Alaska Board of Fisheries amended a regulation governing the allocation of fish among Stepovak and Chignik fishermen. Geographically, the Chignik fishery is between the Igvak fishery and the Stepovak fishery. Sockeye salmon return to Chignik from the east and west, passing through the Stepovak and Igvak fisheries. The overwhelming majority, roughly 80%, of the salmon found in the Igvak and Stepovak fisheries are bound for Chignik.

The Chignik fishery is the oldest of the three fisheries, having been in existence since 1888. Historically, the Stepovak fishery was smaller, but in recent years activity in the Stepovak fishery has increased from 12 to 48 units of gear. The harvest increased six-fold between 1964 and 1984, with 438,000 fish taken in 1984.

In 1976, the Board of Fisheries adopted a general policy against mixed stock interceptor fisheries. Under this policy, spawning escapement would be ensured by allowing stocks to return to their natal streams to spawn. Nevertheless, some mixed stock interceptor fisheries have been allowed because of historical, economic and social factors.

In an effort to conserve and develop fishery resources,[1] AS 16.05.221(a), the Board of Fisheries implemented, at different times, regulations limiting the mixed stock interceptor fisheries in their total percentage of salmon harvest. In addition, fishing season dates were limited to ensure proper escapement for spawning.[2] Proposal Number 232, which came before the Board in its November 1984 meeting, set limitations for the Stepovak fishery almost identical to those already enacted for the Igvak fishery.[3] This proposal was adopted and, accordingly, the Board of Fisheries amended 5 AAC 09.360.

Prior to meeting in November, the Board of Fisheries gave public notice of the meeting agenda. The notice also stated that in the Chignik area, the Board would be considering "set[ting] the fishing season and periods." In addition to publishing this notice in several state newspapers, a packet containing Proposal 232 was distributed statewide and was available to the public.

On April 22, 1985, the appellants, all long-time fishermen and residents of Alaska, filed suit seeking (1) a declaratory judgment that the amended regulation was unconstitutional and (2) injunctive relief against its enforcement. The complaint alleged, among other things, that the amendment was adopted in violation of public notice requirements. The fishermen also filed a motion for a preliminary injunction,

1. "Conserve" and "develop" are, when used in the fishery context, terms of art. We have previously defined "conserving" as "impl[ying] controlled utilization of a resource to prevent its exploitation, destruction or neglect. 'Developing' connotes management of a resource to make it available for use." *Kenai Peninsula Fisherman's Coop. v. State*, 628 P.2d 897, 903 (Alaska 1981).

2. The Igvak fishery was governed by 5 AAC 18.360(a), which provides in part:
 In years when a harvestable surplus beyond escapement goals for the first (Black Lake) and second (Chignik Lake) runs of Chignik River system sockeye salmon is expected to be less than 600,000, there will be no commercial salmon fishery allowed in the Cape Igvak Section ... until a harvest of 300,000 sockeye

salmon in the Chignik Areas ... is achieved. After July 8, after at least 300,000 sockeye salmon have been harvested in the Chignik Area, and if escapement goals are being met, the department shall manage the fishery so that the number of sockeye salmon harvested in the Chignik Area will be at least 600,000 and the harvest in the Cape Igvak Section will approach as near as possible 15 percent of the total Chignik sockeye salmon catch.

3. These limitations included a proscription on fishing until escapement goals had been reached in the Chignik fishery, and set the Stepovak harvest level at approximately six percent of the total Chignik sockeye salmon harvest. 5 AAC 09.360(a)–(f).

which was denied by the trial court on May 24, 1985.

## II

Procedurally, this is an appeal from the grant of summary judgment for the state. Under Civil Rule 56(c), summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Southeast Alaska Construction Co. v. State, Dep't of Transportation,* 791 P.2d 339, 342 (Alaska 1990). Thus, we review *de novo* an order granting summary judgment. *Grand v. Municipality of Anchorage,* 753 P.2d 141, 143 n. 3 (Alaska 1988).

## III

### A

The fishermen first contend that the trial court erred in concluding, as a matter of law, that the public notice requirements codified in AS 44.62.200(a)[4] were satisfied by the Board of Fisheries when adopting Proposal 232. Specifically, the fishermen argue that the Board failed to prepare an adequate informative summary of the proposed changes, as mandated by AS 44.62.-200(a)(3), and neglected to mention that copies of specific proposed changes were available and could be obtained at any of the Fish and Game offices.

■ We have held that the Board of Fisheries "is required to follow APA [Administrative Procedures Act] procedures when adopting regulations pursuant to its statutorily delegated authority." *Kenai Peninsula,* 628 P.2d at 904. A regulation, however, is considered procedurally presumptively valid once a certified copy has been filed. AS 44.62.100; *Kingery v. Chapple,* 504 P.2d 831, 833 (Alaska 1972).

Further, one challenging an administrative regulation "must show ... a substantial failure [to comply with the APA] in order to rebut the presumption of procedural validity." *Chevron U.S.A. v. LeResche,* 663 P.2d 923, 929 (Alaska 1983); *State v. First National Bank of Anchorage,* 660 P.2d 406, 425 (Alaska 1982).

■ The fishermen claim that the informative summary prepared by the Board was not detailed enough in that it did not contain a sufficient informative summary that the quota established in the challenged regulation would be the subject of agency action.

We have in the past focused on the informative summary requirement and concluded that it is to be "liberally construed." *First National Bank,* 660 P.2d at 425 n. 32. Specifically, we have held:

[t]he legislative history of AS 44.62.200 demonstrates that the legislature intended the concepts of reasonable notice and subject matter to be read broadly. The Report of the House Judiciary Committee on HB 786 (later to become AS 44.62.-200) stated in part:

As a result of certain rulings of the superior court in the Third Judicial District, and, apparently, certain opinions and advice from the Department of Law, under the present language of the statute, the board feels that its notice of proposed regulations must be very detailed and specific and that a regulation it adopts may not vary at all from the notice given for that regulation.... The Judiciary Committee believes that *such a restrictive approach is not desirable,* and since this administrative difficulty has arisen there should be some clarification of the law.

---

4. AS 44.62.200(a) provides in part:
The notice of proposed adoption, amendment, or repeal of a regulation must include
 (1) a statement of the time, place, and nature of proceedings for adoption, amendment, or repeal of the regulation;
 (2) reference to the authority under which the regulation is proposed and a reference to the particular code section or other provisions

of law that are being implemented, interpreted or made specific;
 (3) an informative summary of the proposed subject of agency action;
 (4) other matters prescribed by a statute applicable to the specific agency or to the specific regulation or class of regulations;
 (5) a summary of the fiscal information required to be prepared under AS 44.62.195.

*Chevron,* 663 P.2d at 929 (quoting from 1970 House Journal 917–18) (emphasis added).

The notice in the case at bar specifically provided that the Board would be considering the

harvest levels for sockeye salmon by district or section; prohibit or specify interception of salmon bound for adjacent management areas; set harvest levels by species, district, section, or fixed percentages of forecasted returns to adjacent management areas; and adopt, amend, or reject management plans that specify how fisheries will be managed for the conservation and development of the resource and how the available harvest will be allocated between beneficial uses.

. . . .

... by publishing this legal notice, the Board of Fisheries may consider all of the subjects covered by the proposed changes contained in this notice. The board is not limited by the specific language ... of the actual proposals [but it is] limited to the subject matter given in this legal notice[.]

Thus, the state argues the notice was sufficient to make the Stepovak fishermen aware that the Board was considering modifying the allocations.

5. In *First National Bank,* the informative summary merely listed generalized subject headings, *i.e.,* "General Provisions," "Filing Procedures" and "Unfair Acts and Practices." *First National Bank,* 660 P.2d at 425. Nevertheless, we ruled that the challenger "failed to show a violation of the informative summary requirement substantial enough to overcome the statutory presumption of validity." *Id.*

6. The policy at issue here is the Board's mixed stock salmon fisheries policy delineating the Board's principles and goals regulating mixed stock fisheries. The policy provides:

A basic principle of salmon fishery management is that fishing of any salmon stock should not occur until the spawning escapement for that stock is ensured. Run strength and resultant optimum harvest and escapement levels cannot be estimated until discrete stocks have separated themselves from mixed stocks and have arrived in areas near their natal streams. This type of single stock management allows optimum harvest rates on all stocks based on the productivity of individual stocks.

The trial court found that "[t]he undisputed evidence" required it to conclude, as a matter of law:

(5) The "informative summary" given by [the state] contained Proposal 232 which essentially embodied the regulation adopted by the Board of Fisheries as 5 AAC 09.360.

(6) The "informative summary" gave members of the public sufficient information to determine whether their interests would be affected by board action.

We agree. The informative summary in the present case offers more detail than the informative summary we upheld in *First National Bank.*[5] Further, in light of the legislature's intent that the informative summary requirement not be read restrictively, we conclude that the published notice adequately informed interested fishermen of the subject matter to be considered. As we cannot find a "substantial failure" to comply with the informative summary requirement of the APA, we affirm the trial court's conclusion that the Board complied with AS 44.62.200(a)(3).

B

The fishermen next argue that 5 AAC 09.360 was adopted and amended pursuant to a Board policy[6] that was never properly

When developing fisheries management policies, factors other than biological data must be considered. Alaska has historically allowed fishing on certain mixed salmon stocks with the result that fishing fleets and related support activities have developed to harvest those stocks. Thus management policies should also address social and economic factors and weight them accordingly.

In view of the above stated principles, it is the policy of the Board of Fisheries that:

1. In the case of long standing fisheries which fish mixed stocks and for which it may not be feasible for participating fishermen to relocate to fisheries taking more discrete stocks, such fisheries may continue provided that fishing effort on the mixed stocks does not increase and that the harvest rate is not detrimental to the individual stocks.

2. In the case of long standing fisheries which fish mixed stocks and for which it may be feasible for participating fishermen to relocate to fisheries taking more discrete stocks, preference should be given to the fishery that best serves the state's interests.

enacted under the APA. Thus, the fishermen claim the regulation, adopted pursuant to a policy that was not itself properly enacted, is invalid. The state counters by pointing out that (1) the mixed stock policy is not, and should not, be codified as a regulation, and therefore it is "irrelevant" that it was not adopted pursuant to the APA; (2) the policy does not fall within the ambit of the APA, because it is not a "regulation" as defined in the APA, AS 44.62.640(a)(3)[7]; and (3) the policy was not a primary factor in the Board's decision to enact the regulation.

The Board's policy sets forth several basic principles of salmon fishery management. The policy indicates that fishing of salmon stock should not occur before the escapement goals for that stock have been reached. In order to determine escapement levels, the fishery stock must be discrete or separated from other mixed stocks. Thus, interceptor fisheries are discouraged. The Board's policy balances the principles of salmon fishery management with historical, social and economic fishery patterns.

 The legislature has broadly defined what constitutes a regulation under the APA. AS 44.62.640; *State v. Northern Bus Co.*, 693 P.2d 319, 322 (Alaska 1984). The legislature specifically defined "regulation" to "include[ ] ... 'policies' ... and the like, that have the effect of rules,

orders, regulations *or standards of general application."* AS 42.62.640(a)(3) (emphasis added). Indicia for identifying a "regulation" include (1) whether the practice implements, interprets or *makes specific the law enforced or administered by the state agency,* and (2) whether the practice "affects the public or is used by the agency in dealing with the public." *Kenai Peninsula,* 628 P.2d at 905 (emphasis added); AS 42.62.640(a)(3). The Board has labeled its guideline a "policy" and the state concedes this policy statement was not adopted pursuant to the APA. Further, the state claims that the Board does not follow the mixed stock policy in the sense that it feels bound to do so. The board has written down the policy which it does bear in mind when managing mixed stocks simply *because they are the goals the board considers.*

In our view, the state is all but saying the policy has the effect of a "standard of general application," in that it is a goal the Board seeks to obtain. Further, both of the aforementioned indicia of a "regulation" are implicated here: the Board policy "makes [more] specific the law enforced or administered" and the policy "affects the public," insofar as it has been used to modify commercial fishery limits. Thus, we conclude that the policy in question falls

---

3. The development or expansion of mixed stock fisheries should be discouraged when the fish that comprise those stocks can be harvested after they have separated into more discrete stocks.

4. This policy does not prevent the board or the department from allowing mixed stock fisheries, particularly when large returns are expected and the allowance of such fisheries would result in a fuller utilization of the harvestable surplus.

In all decisions relating to the regulation and management of mixed stock fisheries, it is the express intent of the board that the conservation of affected salmon stocks be given first priority over economic and social considerations.

A.S. Robinson, Selected Policies of the Board of Fisheries: Policy Statement on Management of Mixed Stock Salmon Fisheries, at 12 (1983).

7. AS 44.62.640(a)(3) provides that a:

"regulation" means every rule, regulation, order, or standard of general application or the

amendment, supplement or revision of a rule, regulation, order or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency; "regulation" does not include a form prescribed by a state agency or instructions relating to the use of the form, but this provision is not a limitation upon a requirement that a regulation be adopted under this chapter when one is needed to implement the law under which the form is issued; "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, that have the effect of rules, orders, regulations or standards of general application, and this and similar phraseology may not be used to avoid or circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public[.]

squarely within the definition of a "regulation" contained in AS 44.62.640(a)(3) and, therefore, it is required to be implemented pursuant to the APA. This conclusion is buttressed by our decision in *Kenai Peninsula*, 628 P.2d at 905, wherein we observed that a "regulation," under AS 44.62.-640(a)(3), "encompass[es] many statements made by administrative agencies, *including policies and guides to enforcement.*" (Emphasis added).

The trial court granted the state's motion for summary judgment, ruling as a matter of law that the Board's policy was not a regulation. We conclude that the trial court erred. Since the policy falls within the meaning of a "regulation," it was invalid for failure to comply with the APA. *Kenai Peninsula*, 628 P.2d at 906; *Kelly v. Zamarello*, 486 P.2d 906, 910–11 (Alaska 1971). Moreover, as we held in *Kenai Peninsula* "[t]here can be no future reliance on this particular policy or option either in the regulation-making process or as a basis for emergency orders until the procedures required by the APA are observed." 628 P.2d at 906.

### C

■ Having ruled that the Board's policy is a "regulation," and therefore not in compliance with the APA, we must address the impact of the policy's invalidation. The fishermen, relying on *Kenai Peninsula*, assert that if the policy was invalidly adopted, then the amendment to 5 AAC 09.360 must also be invalid, since it was based on that policy. In *Kenai Peninsula*, however, we rejected a similar argument stating:

> If ... the regulations adopted were reasonable and not arbitrary, based on the total information before the board at the time each was adopted and excluding the management priorities established in the policy, the invalidity of the policy would not affect the validity of the fishing season regulations.

*Id.* at 907. Thus, we will test the amendment to 5 AAC 09.360 under this standard.

The regulation at issue here is designed to allow commercial fishing to the extent fishery resources are maximized. Time limitations and harvest quotas, imposed to ensure escapement goals and preserve the fish stock, fall within the meaning of the Board's mandate to "conserve" and "develop" fish resources. *See supra* note 1; AS 16.05.221(a). We conclude that the regulation falls within the ambit of the Board's authority and is reasonably necessary to "conserve" and "develop" fish resources. The regulation was enacted after the Board considered resource management issues, historical and economic factors implicated by the limitations imposed by the regulation, and after receiving public input. We find such administrative rule-making reasonable. We hold, therefore, that the regulation, excluding fish management principles contained within the questioned fishery policy, is reasonable.

■ The fishermen further argue that the amended regulation is arbitrary, because the Board failed "to consider important economic and social factors" in deciding the harvest quotas. In support of this argument, the fishermen claim that the Board failed to deliberate on six economic factors and three social factors. The state, on the other hand, sets forth the detailed ecological, conservation and social factors the Board did consider.

The record demonstrates that the Board conducted public hearings, consulted experts and generally spent considerable effort gathering information before adopting the regulation. The fishermen's argument can be simplified to this point: the Board did not consider *every* possible factor. We, however, do not require perfection for a regulation to be reasonable. Rather,

> [i]n considering whether [a regulation] is arbitrary or unreasonable, this court's task is simply to determine whether the regulation is reasonably related to its goal of allocating the salmon harvest between [users]. We have no authority to substitute our own judgment for the Board of Fisheries' particularly since highly specialized agency expertise is involved. "The 'wisdom' of the regulation is not a subject of review."

*Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 174 (Alaska 1987) (quoting *Kingery v. Chapple,* 504 P.2d at 835). Our role is to guarantee only that an agency "has taken a 'hard look' at the salient problems and has 'genuinely engaged in reasoned decision making.'" *Alaska Survival v. State, Dep't of Natural Resources,* 723 P.2d 1281, 1287 (Alaska 1986) (quoting *Southeast Alaska Conservation Council v. State,* 665 P.2d 544, 549 (Alaska 1983) (in turn quoting Leventhal, *Environmental Decision Making and the Role of the Courts,* 122 U.Pa.L.Rev. 509, 511 (1974) (emphasis omitted))). Our review of the record indicates that the Board did take a close look at the problems affecting Chignik salmon and engaged in reasoned decision making. The fact that every possible factor may not have been debated does not vitiate the reasonableness of the regulation as a whole. There is no evidence this regulation is arbitrary or unreasonable.

### D

The fishermen also contend that, substantively, the amended regulation violates the uniform application clause of article VIII,[8] pertaining to natural resources. The fishermen argue:

> [T]he challenged regulation violates the equal treatment clause of [a]rticle VIII, [s]ec. 17 [in] that the harvest quota established for Stepovak fishermen is subject to different criteria than applied to Cape Igvak and Chignik fishermen. The regulation distinguishes and classifies the amount of catch of Chignik sockeye salmon for those fishermen who fish in Stepovak from those who fish in Chignik and Cape Igvak.

The regulation allows the Igvak fishery to harvest 15% of the Chignik sockeye salmon, 5 AAC 18.360(a)–(c), and allows the Stepovak fishery to harvest 6% of the Chignik sockeye salmon. 5 AAC 09.360(b)–(d). Both the Igvak and Stepovak fisheries are

precluded from fishing until the Chignik fishery is assured a harvest of 300,000 early run fish in order to ensure proper escapement levels to guarantee a sustainable yield. 5 AAC 18.360(a) (Igvak); 5 AAC 09.360(b) (Stepovak).

The fishermen contend that under article VIII, section 3 of the Alaska Constitution,[9] they are entitled to broad access to fish resources and that their right to access such resources should be as equal as that of other fishermen. Thus, the fishermen conclude that the amended regulation confers a special privilege on the Igvak and Chignik fishermen and accordingly, should be subject to "close scrutiny."

■ At the outset, it should be noted that an analysis under article VIII, section 17 may invoke "more stringent review" of a regulation than standard equal protection under article I, section 1. *See McDowell v. State,* 785 P.2d 1, 10 (Alaska 1989); *Owsichek v. State, Guide Licensing & Control Bd.,* 763 P.2d 488, 498 n. 17 (Alaska 1988); *Gilman v. Martin,* 662 P.2d 120, 125–26 (Alaska 1983). Nevertheless, we have upheld a statutory scheme under the uniform application clause if the statute was justifiable for "resource conservation reasons" as expressly authorized under article VIII, section 15. *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1264 (Alaska 1988). Until recently we have not explored an independent analysis under article VIII, section 17 other than to recognize that it may be more stringent than our approach to equal protection under article I, section 1. In *McDowell,* however, heightened scrutiny was applied under the uniform application clause, in striking down the subsistence legislation. 785 P.2d at 10–11.

■ We reject the fishermen's claim that 5 AAC 09.360 establishes a special privilege and violates the uniform application clause. The state has an obligation to manage fish

---

**8.** Article VIII, section 17 provides:

Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

**9.** Article VIII, section 3 provides that:

Wherever occurring in their natural state, fish, wildlife and waters are reserved to the people for common use.

and game resources to the benefit of all in accord with its public trust duties. *Metlakatla Indian Community v. Egan*, 362 P.2d 901, 915 (Alaska 1961), *aff'd*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962). In *Metlakatla* we reasoned that "migrating schools of fish, while in inland waters, are the property of the state, held in trust for the benefit of all the people of the state, and the obligation and authority to equitably and wisely regulate the harvest is that of the state." 362 P.2d at 915. Further, state imposed restrictions, such as "[l]icensing requirements, *bag limits, and seasonal restrictions* ... are time-honored methods of conserving" fish and game resources. *Owsichek*, 763 P.2d at 492 (emphasis added).

■ To satisfy the uniform application clause of article VIII, state fish and game regulations creating non-uniform classifications must (1) have a legitimate purpose.[10] *Owsichek*, 763 P.2d at 496–97 & nn. 13 & 14; *Johns*, 758 P.2d at 1264; *Apokedak*, 606 P.2d at 1265 & nn. 41 & 42. (2) The individual interest in equal access to fish and game resources is a "highly important interest running to each person within the state."[11] *McDowell*, 785 P.2d at 10; *Owsichek*, 763 P.2d at 492 n. 10. (3) Accordingly, once a legitimate purpose has been established by the state, the weight of that interest must be "important" to countervail the important individual interest implicated. *McDowell*, 785 P.2d at 10. (4) The means used to further the important state purpose must be carefully drawn and designed for "the least possible infringement on article VIII's open access values." *McDowell*, 785 P.2d at 10; *Johns*, 758 P.2d at 1266; *Ostrosky*, 667 P.2d at 1191.

There is no dispute that the primary justification for the regulation is fish resource management. The Chignik fishery is the terminal for Chignik salmon as they return to their natal streams, whereas Stepovak and Ignak are interceptor fisheries. Thus, the Chignik harvest quotas and fishing times may vary when necessary, from the other fisheries, in order to ensure proper escapement levels. Further, Stepovak may require different harvest levels than Igvak, to the extent that Stepovak is a comparatively recent fishery that grew dramatically in the 1970's. Igvak, on the other hand, had higher historical catch levels and more gear operators than Stepovak. Thus, the Stepovak fishery is not similarly situated to the Chignik fishery as a matter of biological spawning patterns, and it is not similarly situated with the Igvak fishery in terms of historical catch levels and participation. Since article VIII, section 17 only applies to those who are "similarly situated," it does not apply to this case.

The regulation in question reflects an allocation decision authorized under article VIII, section 4 of the state constitution [12] which the Board must necessarily make between users involved in different fisheries. *McDowell*, 785 P.2d at 8; *Meier*, 739 P.2d at 174 ("The Board's power to control fishery resource utilization allows it to allocate the salmon harvest between these two competing subgroups of commercial users."). Such decisions are within the power of the Board, so long as they are not arbitrary and unreasonable and are "consistent with and reasonably necessary to the conservation and development of Alaska fishery resources." *Id.* at 175; *Kenai Peninsula*, 628 P.2d at 903.

As we noted above, in part III–C, the regulation meets these requirements.

---

**10.** Legitimate purposes which have been recognized, in various contexts are wildlife management and conservation, *Owsichek*, 763 P.2d at 496–97; preventing unjust discrimination; *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1266 (Alaska 1980); and preventing economic distress to fishermen, *State v. Ostrosky*, 667 P.2d 1184, 1191 (Alaska 1983), *appeal dismissed Ostrosky v. Alaska*, 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984).

**11.** The right to commercial fish is not a fundamental right. *Apokedak*, 606 P.2d at 1262. The right to engage in commercial fishing is, however, an important economic right. *Id.* at 1266.

**12.** Article VIII, section 4 states:
Fish, forest, wildlife, grasslands, and all other replenishible resources belonging to the state shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.

We AFFIRM the trial court's ruling finding the informative summary in compliance with the APA, we REVERSE the trial court's conclusion that the mixed stock fishery policy was not a "regulation" under the APA, and we AFFIRM the trial court's ruling upholding the amended regulation under the APA and article VIII, section 17 of the Alaska Constitution.