STATE of Alaska and Carl L. Rosier, in his official capacity as Commissioner of Fish and Game, Appellants,

v.

KENAITZE INDIAN TRIBE, Ninilchik Traditional Council, Knik Tribal Council, and the Native Village of Eklutna, Appellees.

No. S–6162.

Supreme Court of Alaska.

May 9, 1995.

Rehearing Denied June 2, 1995.

Stephen M. White, Asst. Atty. Gen., Juneau; T. Henry Wilson, Asst. Atty. Gen., Anchorage, Bruce M. Botelho, Atty. Gen., Juneau, for appellants.

Carol H. Daniel, Alaska Legal Services Corp., Eric Smith, Anchorage, William E. Caldwell, Alaska Legal Services Corp., Fairbanks, for appellees.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

*OPINION*

MATTHEWS, Justice.

The issues in this case are whether the Alaska Constitution is violated by a statute which (1) requires the creation of areas in which permits for subsistence hunting and fishing may not be granted, and (2) grants priority hunting and fishing rights to a preferred class of subsistence users based on where they reside.

## I. BACKGROUND

Since 1978, subsistence hunting and fishing has had statutory priority over sport and commercial hunting and fishing.[1] In practice, when a fish or game population is insufficient to supply all consumptive uses consistent with the sustained yield principle, nonsubsistence uses must be restricted; when a population is sufficient only to supply subsistence uses, nonsubsistence uses must be eliminated.[2]

From the outset, the statute establishing the subsistence priority created two tiers of subsistence users.[3] The first tier includes all subsistence users.[4] The second tier is more restricted. Tier II status becomes important when a fish or game population is inadequate to satisfy all subsistence needs. In such cases Tier I users' harvest opportunities must be curtailed or eliminated so that Tier II users can harvest the population.[5]

Under the current statutory formulation the Boards of Fisheries and Game define Tier II subsistence users based on:

(i) the customary and direct dependence on the fish stock or game population by the subsistence user for human consumption as a mainstay of livelihood;

(ii) the proximity of the domicile of the subsistence user to the stock or population; and

---

1. Ch. 151, § 5, SLA 1978; *Madison v. Alaska Dep't of Fish & Game,* 696 P.2d 168, 174 n. 12 (Alaska 1985).

2. AS 16.05.258(b)(4), set forth at note 18 *infra.*

3. Ch. 151, § 4, SLA 1978.

4. AS 16.05.258(b)(3), set forth at note 18 *infra.*

5. AS 16.05.258(b)(4), set forth at note 18 *infra.*

(iii) the ability of the subsistence user to obtain food if subsistence is restricted or eliminated.

AS 16.05.258(b)(4)(B).

In 1986 the subsistence statute was amended to define subsistence hunting and fishing as activities which can be undertaken "only by a resident domiciled in a rural area of the state."[6] The term "subsistence uses" was also defined as requiring residency in a rural area.[7] A rural area, in turn, was defined as "a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area."[8] Subsistence activities were limited to rural areas.[9]

In *McDowell v. State,* 785 P.2d 1 (Alaska 1989), we held that the 1986 statute was unconstitutional insofar as it disqualified as subsistence users residents of areas classified as nonrural. Following *McDowell,* all Alaskans became eligible to participate in subsistence hunting and fishing. *State v. Morry,* 836 P.2d 358, 368 (Alaska 1992).

In 1992 the legislature revised the subsistence statute.[10] As revised, the statute continues to grant subsistence a priority over other consumptive uses and continues to provide for two tiers of subsistence users.[11] However, the new statute also requires the Boards to identify nonsubsistence areas—areas where no subsistence priority exists.[12] The definition of a nonsubsistence area under the 1992 revision, "an area or community where dependence upon subsistence is not a principal characteristic of the economy, culture, and way of life of the area or communi-

ty," is essentially the negative of the definition of "rural area" which is still defined as "a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area."[13] The nonsubsistence provisions of the 1992 revisions to AS 16.05.258 expire on October 1, 1995, and the 1986 version again becomes law.[14]

Pursuant to the 1992 revisions, the Boards established the "Anchorage/MatSu/Kenai nonsubsistence area" encompassing most of the Kenai Peninsula, all of the Municipality of Anchorage, and much of the Matanuska Susitna Borough. In addition, the Boards established nonsubsistence areas in regions surrounding Fairbanks, Ketchikan, Juneau, and Valdez. 5 AAC 99.015.

## II.  *PROCEEDINGS BELOW*

The Kenaitze Indian Tribe filed suit in 1991, seeking a judicial declaration (1) that it was entitled to operate a communal set net in the Kenai River and (2) that the State was not managing the salmon stocks in Upper Cook Inlet in accordance with the subsistence priority as required by law. When the Boards established the Anchorage/MatSu/Kenai nonsubsistence area, Kenaitze amended its complaint to state claims that the nonsubsistence area violated its members' state constitutional rights under the equal access clauses of article VIII, sections 3, 15, and 17, and the equal rights and opportunities clause of article I, section 1 of the Alaska Constitution. Further, Kenaitze claimed that the Boards' creation of the An-

---

6.  Ch. 52, §§ 9, 11, SLA 1978; AS 16.05.940(28)–(29) (1986); *McDowell v. State,* 785 P.2d 1 (Alaska 1989).

7.  Ch. 52, § 10, SLA 1978; AS 16.05.940(30) (1986).

8.  Ch. 52, § 11, SLA 1978; AS 16.05.940(25) (1986).

9.  Ch. 52, § 6, SLA 1978; AS 16.05.258(a) (1986) provided:

  The Board of Fisheries and the Board of Game shall identify the fish stocks and game populations, or portions of stocks and popula-

tions, that are customarily and traditionally used for subsistence in each rural area identified by the boards.

10.  Ch. 1, SSSLA (Second Special Session Laws Amended) 1992.

11.  AS 16.05.258(b)(4)(B) set forth at note 18 *infra.*

12.  AS 16.05.258(c) set forth at note 18 *infra.*

13.  AS 16.05.940(27).

14.  Ch. 1, §§ 3, 12, SSSLA 1992.

chorage/MatSu/Kenai nonsubsistence area was not in compliance with the 1992 statute because the Boards had exceeded their authority and acted arbitrarily. The Ninilchik Traditional Council, the Native Village of Eklutna, and the Knik Tribal Council intervened and filed similar claims.[15]

The State and Kenaitze filed cross-motions for partial summary judgment on their constitutional claims. The superior court granted the motion of Kenaitze and denied that of the State. The court entered a final judgment declaring the nonsubsistence area provision of the 1992 act unconstitutional in violation of article VIII, sections 3, 15, and 17 of the Alaska Constitution and therefore void, and severed AS 16.05.258(c) from the remainder of the 1992 act. The other claims of Kenaitze were declared moot. The State now appeals.

Briefly stated, the rationale of the superior court was as follows. Residents of nonsubsistence areas and residents of subsistence areas are similarly situated classes. The former are treated differently than the latter because "only residents outside of nonsubsistence areas ... are afforded convenient local subsistence access to fish and game resources." Moreover, when fish and game populations are insufficient to satisfy all subsistence needs and the Tier II preference is invoked, "residents of nonsubsistence areas will inevitably suffer compared to other subsistence users," because the section which determines who may become a Tier II hunter or fisherman "requires consideration of 'the proximity of the domicile of the subsistence user to the stock or population.' AS 16.05.258(b)(4)(B)(ii)." This differential treatment may be justified by the need to allocate fish and wildlife resources "given the key social and economic roles that subsistence, sport, and commercial fishing and hunting play in the state, as well as the mandate of article VIII, section 4 of the Alaska Constitution that replenishable resource utilization be 'subject to preferences among beneficial uses.'" However, based on

language in *Gilbert v. State*, 803 P.2d 391, 399 (Alaska 1990), an allocation must restrict competing uses to the least possible extent consistent with the purpose of the allocation. Alaska Statute 16.05.258(c) fails to meet this requirement as it bars subsistence in a particular area without requiring consideration of resource availability: "To create areas where subsistence activities are flatly prohibited, without consideration of whether the resources in the area could support some kind of balance between subsistence, sport and commercial hunting and fishing, does not further the state's expressed purpose to 'allocate' resources among user groups." The superior court concluded as follows:

> Stepping back to view the statute in light of its history, it becomes apparent that the criteria in AS 16.05.258(c) for determining nonsubsistence areas effectively re-establish the rural/urban residency requirement struck down in *McDowell*. The statutory language defining "rural areas" in the 1986 statute is repeated in the definition of "nonsubsistence areas" under the 1992 statute. *Compare* AS 16.05.940(25) (1986) *with* AS 16.05.258(c) (1992). The only significant change has been to do away with the requirement that only rural residents may become members of the subsistence user class, although subsistence use is still allowed only in rural areas. The statute, by selectively prohibiting local subsistence activities and conferring "tier two" advantages based on the proximity of one's domicile to available subsistence resources, is plainly discriminatory against residents of nonsubsistence areas. Such a substantially residency-based classification scheme, under *McDowell*, violates the equal access clauses of the Alaska Constitution.

Because of the importance of the role that the Tier II domicile factor assumed in the rationale of the superior court, we ordered that the parties brief the constitutionality of this factor along with the other issues in the case.[16]

**15.** We will hereafter refer to all the appellees as "Kenaitze."

**16.** Our order stated: "To the extent that 'tier two' subsistence users are permitted to take fish

and game for subsistence use based on the 'proximity of the domicile of the subsistence user to the stock or population,' AS 16.05.258(b)(4)(B)(ii), is tier two unconstitutional

III. *DISCUSSION*

A. *Relevant Constitutional and Statutory Provisions*

The equal access clauses of the Alaska Constitution are article VIII, sections 3, 15, and 17; the sustained yield clause is contained in article VIII, section 4.[17] Alaska Statute 16.05.258 is the current subsistence statute.[18,19] Section 1 of chapter 1, SSSLA under *McDowell v. State,* 785 P.2d 1 (Alaska 1989)?"

17. Section 3 of article VIII provides:
    Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.
    Section 4 of article VIII provides:
    Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.
    Section 15 of article VIII provides:
    No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.
    Section 17 of article VIII provides:
    Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

18. AS 16.05.258 provides:
    (a) Except in nonsubsistence areas, the Board of Fisheries and the Board of Game shall identify the fish stocks and game populations, or portions of stocks or populations, that are customarily and traditionally taken or used for subsistence. The commissioner shall provide recommendations to the boards concerning the stock and population identifications. The boards shall make identifications required under this subsection after receipt of the commissioner's recommendations.
    (b) The appropriate board shall determine whether a portion of a fish stock or game population identified under (a) of this section can be harvested consistent with sustained yield. If a portion of a stock or population can be harvested consistent with sustained yield, the board shall determine the amount of the harvestable portion that is reasonably necessary for subsistence uses and
    (1) if the harvestable portion of the stock or population is sufficient to provide for all consumptive uses, the appropriate board
    (A) shall adopt regulations that provide a reasonable opportunity for subsistence uses of those stocks or populations;
    (B) shall adopt regulations that provide for other uses of those stocks or populations, subject to preferences among beneficial uses; and
    (C) may adopt regulations to differentiate among uses;
    (2) if the harvestable portion of the stock or population is sufficient to provide for subsistence uses and some, but not all, other consumptive uses, the appropriate board
    (A) shall adopt regulations that provide a reasonable opportunity for subsistence uses of those stocks or populations;
    (B) may adopt regulations that provide for other consumptive uses of those stocks or populations; and
    (C) shall adopt regulations to differentiate among consumptive uses that provide for a preference for the subsistence uses, if regulations are adopted under (B) of this paragraph;
    (3) if the harvestable portion of the stock or population is sufficient to provide for subsistence uses, but no other consumptive uses, the appropriate board shall
    (A) determine the portion of the stocks or populations that can be harvested consistent with sustained yield; and
    (B) adopt regulations that eliminate other consumptive uses in order to provide a reasonable opportunity for subsistence uses; and
    (4) if the harvestable portion of the stock or population is not sufficient to provide a reasonable opportunity for subsistence uses, the appropriate board shall
    (A) adopt regulations eliminating consumptive uses, other than subsistence uses;
    (B) distinguish among subsistence users, through limitations based on
    (i) the customary and direct dependence on the fish stock or game population by the subsistence user for human consumption as a mainstay of livelihood;
    (ii) the proximity of the domicile of the subsistence user to the stock or population; and
    (iii) the ability of the subsistence user to obtain food if subsistence use is restricted or eliminated.
    (c) The boards may not permit subsistence hunting or fishing in a nonsubsistence area. The boards, acting jointly, shall identify by regulation the boundaries of nonsubsistence areas. A nonsubsistence area is an area or community where dependence upon subsistence is not a principal characteristic of the economy, culture, and way of life of the area or community. In determining whether dependence upon subsistence is a principal characteristic of the economy, culture, and way of life of an area or community under this subsection, the boards shall jointly consider the relative importance of subsistence in the context of the totality of the following socio-economic characteristics of the area or community:

1992 contains the legislative findings, purpose and intent with respect to the 1992 subsistence revisions.[20]

(1) the social and economic structure;

(2) the stability of the economy;

(3) the extent and the kinds of employment for wages, including full-time, part-time, temporary, and seasonal employment;

(4) the amount and distribution of cash income among those domiciled in the area or community;

(5) the cost and availability of goods and services to those domiciled in the area or community;

(6) the variety of fish and game species used by those domiciled in the area or community;

(7) the seasonal cycle of economic activity;

(8) the percentage of those domiciled in the area or community participating in hunting and fishing activities or using wild fish and game;

(9) the harvest levels of fish and game by those domiciled in the area or community;

(10) the cultural, social, and economic values associated with the taking and use of fish and game;

(11) the geographic locations where those domiciled in the area or community hunt and fish;

(12) the extent of sharing and exchange of fish and game by those domiciled in the area or community;

(13) additional similar factors the boards establish by regulation to be relevant to their determinations under this subsection.

(d) Fish stocks and game populations, or portions of fish stocks and game populations not identified under (a) of this section may be taken only under nonsubsistence regulations.

(e) Takings and uses of fish and game authorized under this section are subject to regulations regarding open and closed areas, seasons, methods and means, marking and identification requirements, quotas, bag limits, harvest levels, and sex, age, and size limitations. Takings and uses of resources authorized under this section are subject to AS 16.05.831 and AS 16.30.

(f) For purposes of this section, "reasonable opportunity" means an opportunity, as determined by the appropriate board, that allows a subsistence user to participate in a subsistence hunt or fishery that provides a normally diligent participant with a reasonable expectation of success of taking of fish or game.

**19.** AS 16.05.940, also relevant, provides in part:

(7) "customary and traditional" means the noncommercial, long-term, and consistent taking of, use of, and reliance upon fish or game in a specific area and the use patterns of that fish or game that have been established over a reasonable period of time taking into consideration the availability of the fish or game;

....

(24) "personal use fishing" means the taking, fishing for, or possession of finfish, shellfish, or other fishery resources, by Alaska residents for personal use and not for sale or barter, with gill or dip net, seine, fish wheel, long line, or other means defined by the Board of Fisheries;

....

(27) "rural area" means a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area;

....

(30) "subsistence fishing" means the taking of, fishing for, or possession of fish, shellfish, or other fisheries resources by a resident domiciled in a rural area of the state for subsistence uses with gill net, seine, fish wheel, long line, or other means defined by the Board of Fisheries;

(31) "subsistence hunting" means the taking of, hunting for, or possession of game by a resident domiciled in a rural area of the state for subsistence uses by means defined by the Board of Game;

(32) "subsistence uses" means the noncommercial, customary and traditional uses of wild, renewable resources by a resident domiciled in a rural area of the state for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter, or sharing for personal or family consumption; in this paragraph, "family" means persons related by blood, marriage, or adoption, and a person living in the household on a permanent basis[.]

**20.** FINDINGS, PURPOSE, AND INTENT. (a) The legislature finds that

(1) there are Alaskans, both Native and non-Native, who have a traditional, social, or cultural relationship to and dependence upon the wild renewable resources produced by Alaska's land and water; the harvest and use of fish and game for personal and group consumption is an integral part of those relationships;

(2) although customs, traditions, and beliefs vary, these Alaskans share ideals of respect for nature, the importance of using resources wisely, and the value and dignity of a way of life in which they use Alaska's fish and game for a substantial portion of their sustenance; this way of life is recognized as "subsistence";

(3) customary and traditional uses of Alaska's fish and game originated with Alaska Natives, and have been adopted and supplemented by many non-Native Alaskans as well; these uses, among others, are culturally, socially, spiritually, and nutritionally important and provide a sense of identity for many subsistence users;

## B. *Is the "Proximity of the Domicile" Factor Unconstitutional?*

■ We turn first to the question of whether linking eligibility for Tier II subsistence status to "proximity of the domicile of the subsistence user" to the target fish or game population violates article VIII, sections 3, 15, and 17 of the Alaska Constitution. This question is governed by our decision in *McDowell v. State,* 785 P.2d 1 (Alaska 1989).

At issue in *McDowell* was whether provisions in the 1986 subsistence statute which barred all nonrural Alaska residents from eligibility as first or second tier subsistence users violated the article VIII equal access clauses. *Id.* at 1. We held that the rural preference was a special privilege explicitly barred by the first sentence of section 15 and implicitly barred by the common use and equal application clauses, sections 3 and 17. *Id.* at 6, 9. We concluded "that the requirement contained in the 1986 subsistence statute, that one must reside in a rural area in order to participate in subsistence hunting and fishing, violates sections 3, 15, and 17 of article VIII of the Alaska Constitution." *Id.* at 9.

Concerning sections 3, 15, and 17 of article VIII, we observed that while they have varied ramifications they share one meaning: "exclusive or special privileges to take fish and wildlife are prohibited." *Id.* at 6. We noted that these clauses afford protection against the creation of a "closed class" of fish and game users. *Id.* at 6–7. We observed that although the state was empowered to make decisions concerning which among such diverse groups as commercial, sport and subsistence users would have a preferred right to harvest a certain species, that authority "does not imply a power to limit admission to a user group." *Id.* at 8. We explained that the constitution does not bar "all methods of exclusion where exclusion is required for species protection reasons." *Id.* at 9. While we had no occasion to state what exclusionary criteria might be permissible in such circumstances, the opinion makes it clear that residence-based criteria are not permissible. We both quoted and stressed language holding that people who reside near a fish or game population do not have a higher claim to that population than state residents whose domiciles are more distant:

Where the necessity for the preservation of the wild game and fish exists in certain territories of the state, that territory may be segregated for the purpose of regulating the right to taking game and fish therein; *but the privilege of taking and using same must be extended to the people of the state outside of the territory upon the same terms that are given to those who are residents of the territory embraced in the legislation.*

*Id.* at 12 (quoting *Lewis v. State,* 110 Ark. 204, 161 S.W. 154, 155–56 (1913)) (emphasis added by this court in *McDowell*).

Our holding in *McDowell* is controlling here. The requirements of the equal access clauses apply to both tiers of subsistence users. Just as eligibility to participate in all subsistence hunting and fishing cannot be made dependent on whether one lives in an urban or rural area, eligibility to participate in Tier II subsistence hunting and fishing cannot be based on how close one lives to a given fish or game population.[21]

(4) while Alaska's fish and game are generally still plentiful, these resources are not unlimited and cannot provide for every desired use, now or in the future; competition for and the level of effort on these resources have required the legislature and the Board of Fisheries and Board of Game to establish a preference for subsistence among the various beneficial uses of fish and game in the state; and

(5) in most areas of the state, a preference for subsistence can be provided without an overly burdensome intrusion upon other consumptive uses of fish and game.

(b) It is the purpose of this Act

(1) to develop and maintain healthy fish stocks and game populations through management based on the sustained yield principle; and

(2) to provide for a preference for subsistence uses over other consumptive uses of fish and game resources.

(c) It is the intent of the legislature that

(1) subsistence uses of Alaska's fish and game resources are given the highest preference, in order to accommodate and perpetuate those uses; and

(2) this Act not result in significant reallocations of fish and game in Alaska.

21. Section 3 of article VIII is particularly strong in requiring that proximity to the resource be a neutral factor. It reserves "to the people for

We conclude that AS 16.05.258(b)(4)(B)(ii), which uses the proximity of the domicile of the Tier II subsistence permit applicant to the fish or game population which the applicant wishes to harvest as a basis for the applicant's eligibility, violates sections 3, 15, and 17 of article VIII of the Alaska Constitution.

■ The question which flows from this conclusion is whether the entire subsistence statute should be declared unconstitutional or whether AS 16.05.258(b)(4)(B)(ii) may be severed from the rest of the statute.

A general severability clause is contained in AS 01.10.030:

> Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language: "If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of this Act and the application to other persons or circumstances shall not be affected thereby."

In *Lynden Transport, Inc. v. State*, 532 P.2d 700, 712–13 (Alaska 1975), we indicated that this clause reverses the common law presumption against severability and creates a slight presumption in favor of severability:

> A provision will not be deemed severable "unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall."

*Id.* at 713 (quoting *Dorchy v. Kansas*, 264 U.S. 286, 290, 44 S.Ct. 323, 324, 68 L.Ed. 686 (1924)). "The key question is whether the portion remaining, once the offending portion of the statute is severed, is independent and complete in itself so that it may be presumed that the legislature would have enacted the valid parts without the invalid part." *Sonneman v. Hickel*, 836 P.2d 936, 941 (Alaska 1992).

Deleting subpart (ii) from AS 16.05.258(b)(4)(B) results in a subsection which requires the creation of a Tier II class of subsistence users based on dependence on the target fish or game population and the ability of the individual subsistence user to obtain food if subsistence use of the particular population were restricted or eliminated. The subsection as thus redacted is logically complete and capable of being given legal meaning.

Whether the legislature would have intended the subsection as redacted to stand had it known that the proximity of the domicile clause would be held unconstitutional is a question which cannot be answered with complete confidence. However, given the importance of subsistence as reflected in the legislative findings prefacing the 1992 act,[22] periods in which individuals needfully dependent on subsistence are deprived of an opportunity to harvest fish or game are to be avoided. A holding that subsection (B)(ii) is not severable could result in such a period. Given this, and the statutory presumption in favor of severability, we conclude that (B)(ii) is severable.

### C. *Is AS 16.05.258(c) Unconstitutional?*

■ Alaska Statute 16.05.258(c) requires the Boards to "identify by regulation" non-subsistence areas.[23] In these areas, the subsistence priority over sport and commercial uses does not apply, and the statute states that "[t]he boards may not permit subsistence hunting or fishing." However, personal use fishing[24] and sport hunting are allowed. As the methods of conducting these pursuits are similar to their subsistence counterparts, the critical difference in non-subsistence areas is the absence of the subsistence priority. When this is appreciated, the superior court's conclusion that section 258(c) authorizes the creation of "areas where subsistence activities are flatly prohibited, without consideration of whether the resources in the area could support some kind of balance between subsistence, sport,

common use" wild fish and game "[w]herever occurring."

**22.** *See* note 20 *supra.*

**23.** AS 16.05.258(c) set forth at note 18 *supra.*

**24.** *See* note 18 *supra* for a statutory definition.

and commercial" uses may be critically examined. Subsistence activities—fishing with nets or other devices or hunting with firearms for food for personal and family consumption—are in no sense flatly prohibited in nonsubsistence areas. Though subsistence permits may not be issued, subsistence activities can still take place. What is eliminated in nonsubsistence areas is the statutory subsistence priority. Without the subsistence priority, a balance may be struck in allocating fish and game resources between commercial, sport, and subsistence types of activities. The interests of all competing users can be considered.[25] With the statutory subsistence priority intact no balance is possible as long as a fish or game population is not sufficient to provide for all subsistence uses.

A nonsubsistence area "is an area or community where dependence upon subsistence is not a principal characteristic of the economy, culture, and way of life of the area or community."[26] Under the 1986 subsistence statute, only fish and game populations in rural areas could be exploited for subsistence purposes.[27] A "rural area" was defined as a "community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area."[28] Thus, the areas defined as "nonrural" under the 1986 statute are now defined as "nonsubsistence areas" under the 1992 statute. What the 1992 statute adds is the requirement that the Boards jointly consider the relative importance of subsistence in a given area based on twelve enumerated socio-economic factors.[29] Even this did not signal a change in practice, however, as the twelve factors parallel twelve factors expressed in a regulation used by the Boards to determine whether an area was "rural."[30]

The superior court held that AS 16.05.258(c) is unconstitutional for reasons which we have summarized above. *See supra* at 635. Much of the court's rationale was based on the proximity of the domicile requirement of AS 16.05.258(b)(4)(B)(ii) which effectively barred residents of nonsubsistence areas from participating in Tier II hunts. With the proximity of the domicile requirement stricken, the remaining detriment to residents of nonsubsistence areas identified by the superior court is a claim of differential treatment based on inconvenience: "[O]nly residents outside of nonsubsistence areas ... are afforded convenient local subsistence access to fish and game resources."

Inconvenience is in no sense the equivalent of a bar to eligibility for participation in subsistence hunting and fishing and does not suffice to trigger an analysis under the equal access clauses. What we recently stated in *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1318 (Alaska 1994), is also applicable to the current case:

> We have held that the "common use" clause of article VIII, section 3, the "no exclusive right of fishery" clause of section 15, and the "uniform application" clause of section 17 are not implicated unless limits are placed on the admission to resource user groups. *McDowell v. State*, 785 P.2d 1, 8 & n. 14 (Alaska 1989); *see also Owsichek v. State, Guide Licensing & Control Board*, 763 P.2d 488, 492 (Alaska 1988). Article VIII limitations on the state's power to restrict access to natural resource user groups do not apply to the state's authority to allocate fishery resources among sport, commercial, and subsistence users. In *Kenai Peninsula [Fishermen's Cooperative Ass'n v. State*, 628 P.2d 897 (Alaska 1981)] we said:

---

25. *See* AS 16.05.251(e) (Board has "authority to allocate resources among all fisheries."); *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917 (Alaska 1991) ("The Board of fisheries may allocate fishery resources among personal use, sport, guided sport, and commercial fisheries.").

26. AS 16.05.258(c) set forth at note 18 *supra*.

27. Ch. 52, § 6, SLA 1978; AS 16.05.258(a) (1986) set forth at note 9 *supra*.

28. Ch. 52, § 11, SLA 1978; AS 16.05.940(25) (1986). Under the 1992 act this definition is found in AS 16.05.940(27).

29. AS 16.05.258(c)(1)–(12) set forth at note 18 *supra*.

30. 5 AAC 99.012 (1986).

While section 15 does prohibit granting monopoly fishing rights, that section was not meant to prohibit differential treatment of such diverse user groups as commercial, sports, and subsistence fishermen. To conclude that, because a certain species is made available for sport fishing in a given area, commercial fishing of the same species in the same area must also be allowed, would be to go far beyond the purpose of the section.

628 P.2d at 904.

The fact that residents of nonsubsistence areas must travel in order to utilize subsistence permits is not a limitation to their admission to a subsistence user group.[31] Further, just as the fact that a certain species is made available for sport fishing in a given area does not mean that the same species must be made available for commercial fishing in the same area, the fact that a certain species is made available for sport or commercial use in a given area does not mean that the constitution commands that the same species be made available in the same area for priority subsistence use.

The legislature has mandated that the Boards, in determining which areas are to be nonsubsistence areas, make decisions allocating fish and game resources among competing users. Such decisions are constitutionally required under article VIII, section 4 of the Alaska Constitution.[32] "The state may, indeed must, make allocation decisions between sport, commercial, and subsistence users." *McDowell v. State*, 785 P.2d 1, 8 (Alaska 1989). Allocation decisions entail a complex mixture of biological, historical, and socio-economic factors.[33] These factors are "often competing." *Tongass Sport Fishing Ass'n*, 866 P.2d at 1319.

In reviewing allocation decisions made by the Board, a deferential standard of review is employed. Board decisions are upheld so long as they are not unreasonable or arbitrary and proper procedures have been followed. *Id.* (Board's decision favorable to commercial trollers concerning allocation of king salmon in Southeast Alaska not "unreasonable or arbitrary"); *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391, 399 (Alaska 1990) (Board's decision allocating sockeye salmon between commercial fishing interests in two areas on the Alaska Peninsula not arbitrary or unreasonable); *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174–175 (Alaska 1987) (Board's decision allocating sockeye salmon between commercial setnetters and driftnetters in Bristol Bay "reasonable and not arbitrary."). We have not subjected allocation decisions to the more rigorous least restrictive alternative test employed in cases where entry into a user class is restricted. *Compare McDowell*, 785 P.2d at 10; *Owsichek*, 763 P.2d at 498 n. 17; and *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1266 (Alaska 1988), *with Tongass*, 866 P.2d at 1319; *Gilbert*, 803 P.2d at 399; and *Meier*, 739 P.2d at 175.[34] Allocation

**31.** In *State v. Hebert*, 803 P.2d 863 (Alaska 1990), we upheld against a claim of article VIII violation a system which frankly was designed to favor local fishermen. *Id.* at 864. Under this system, "super-exclusive" districts were imposed in two Bering Sea sac roe herring fisheries. Fishermen who fished in one super-exclusive district could not fish for herring in any other district, super-exclusive or otherwise. *Id.* Fishermen who fished in any other district could not participate in either super-exclusive district. *Id.* While this system inconvenienced and limited the fishing options both of fishermen residing adjacent to each super-exclusive district and those in more distant locations, we held that the equal access clauses were not violated. *Id.* at 866. Both groups had an equal opportunity to fish in all districts except the super-exclusive districts, or in one of the super-exclusive districts but no other district. *Id.*

**32.** *See* note 17 *supra*.

**33.** *See, e.g.,* AS 16.05.251(e); *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314 (Alaska 1994); *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391 (Alaska 1990); *Meier v. State, Bd. of Fisheries*, 739 P.2d 172 (Alaska 1987).

**34.** While we stated in *Gilbert* that "to satisfy the uniform application clause of article VIII, state fish and game regulations creating nonuniform classifications *must*" have a legitimate and important purpose and "[t]he means used to further the important state purpose must be carefully drawn and designed for 'the least possible infringement on article VIII's open access values,'" *Gilbert* 803 P.2d at *399*, we did not use this test in *Gilbert*. We went on to state that allocation "decisions are within the power of the Board, so long as they are not arbitrary and unreasonable and are 'consistent with and reasonably necessary to the conservation and development of Alaska fishery resources,'" *id.* (quot-

decisions are so complex and multi-faceted that they are not amenable to analysis under such a test.

In this case, the court did not reach the question of whether the joint Boards acted unreasonably or arbitrarily in creating the Anchorage/MatSu/Kenai nonsubsistence area. Instead, the court ruled that the statute was invalid on its face using a least restrictive alternative test. Given the proximity of the domicile Tier II requirement, use of this test was not error, for that requirement erected a bar to admission to a user class. However, with this requirement stricken from the statute, this test no longer applies.

Alaska Statute 16.05.258(c), as it stands without the domicile proximity requirement, contains no characteristics implicating the equal access clauses of article VIII. It bars no Alaskan from participating in any fish or game user class. As these clauses formed the basis for the superior court's decision and no alternative grounds for upholding the court's decision have been argued, the decision must be reversed.

## IV. CONCLUSION

The Tier II proximity of the domicile factor violates sections 3, 15, and 17 of article VIII of the Alaska Constitution, because it bars Alaska residents from participating in certain subsistence activities based on where they live. The statutory section mandating the creation of nonsubsistence areas does not violate these sections. The judgment of the superior court is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

ing *McDowell,* 785 P.2d at 10; *Kenai Peninsula,* 628 P.2d at 903), and reviewed the allocation

decision in question under this standard.